# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
           *Plaintiff-Appellant,*

           v.

YACOV YIDA,
           *Defendant-Appellee.*

No. 06-10460

D.C. No.
CR-00-00274-CRB

OPINION

Appeal from the United States District Court
for the Northern District of California
Charles R. Breyer, District Judge, Presiding

Argued and Submitted
February 15, 2007—San Francisco, California

Filed August 16, 2007

Before: Ronald M. Gould and Milan D. Smith, Jr.,
Circuit Judges, and Alfred V. Covello,* District Judge.

Opinion by Judge Gould;
Concurrence by Judge Gould

---

*The Honorable Alfred V. Covello, Senior United States District Judge
for the District of Connecticut, sitting by designation.

**COUNSEL**

Josh A. Cohen (argued and on the brief), Assistant Federal Public Defender, and Barry J. Portman (on the brief), Federal Public Defender, San Francisco, California, for defendant-appellee Yacov Yida.

Dana R. Wagner (argued and on the brief), Assistant United States Attorney, and Kevin V. Ryan, United States Attorney, Barbara J. Valliere, Assistant United States Attorney, Chief, Appellate Section, and James T. Chou, Assistant United States Attorney, San Francisco, California, (on the brief) for plaintiff-appellant United States of America.

## OPINION

GOULD, Circuit Judge:

The United States government appeals the district court's order excluding the former trial testimony of witness David Reziniano in the retrial of defendant Yacov Yida. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3731. We affirm the district court's decision excluding Reziniano's testimony.[1]

## I

In 1999 and 2000, Yida, Reziniano, and other co-conspirators allegedly participated in an ecstasy smuggling operation. Reziniano pleaded guilty in 2004 to conspiring to import ecstasy and was sentenced to a term of sixty-three months. On November 25, 2005, Reziniano, a native and citizen of Israel, was released into the custody of the Department of Homeland Security ("DHS") for deportation proceedings. Reziniano did not contest the proceedings and on December 7, 2005, an immigration judge ordered his deportation.

---

[1]In a published order following oral argument, we invited amicus briefing on the important issues raised in this appeal. *See United States v. Yida*, 478 F.3d 1068 (9th Cir. 2007). We thank the National Association of Criminal Defense Lawyers, Professor Richard D. Friedman from the University of Michigan Law School, and Aaron Petty, a recent graduate of the University of Michigan Law School, for their responsive amicus briefs, which we received in addition to the parties' supplemental briefing.

Special Agent Catherine Miller of Immigration and Customs Enforcement obtained a material witness warrant for Reziniano on December 8, 2005, as he was scheduled to testify at Yida's upcoming trial. Reziniano remained in custody pursuant to the material witness warrant for about five months before and during Yida's April 2006 trial. During his incarceration, Reziniano complained that his medical and dietary needs were not being adequately addressed, and that he wished to be released from custody and deported.[2]

On April 4, 2006, Reziniano testified that he had conspired with Yida to import ecstasy into the United States via Europe on multiple occasions.[3] According to the government, "Reziniano proved to be a critical witness at trial" because he (1) corroborated testimony from other witnesses; (2) "presented substantial first-hand information about Yida's role in the charged conspiracy that no other witness could provide"; and (3) "testified about the origins of the conspiracy and described in detail how he and Yida had smuggled ecstasy into the United States." Reziniano was thoroughly cross-examined at trial by Yida's defense counsel. The jury reached an impasse in its deliberations, and the district court declared a mistrial on April 13, 2006. At an April 26 status conference, the court set a new trial date of July 24, 2006, which was later advanced to July 17.

---

[2]At no time during the five months that Reziniano was detained as a material witness did the government or Reziniano seek bail. After January 13, 2006, neither the government nor Reziniano complained to the district court about the conditions of Reziniano's confinement or sought an expedited trial date to accommodate his desire to be deported as soon as possible.

[3]In addition to his testimony on his conspiracy with Yida, Reziniano testified that he had been involved in other narcotics-related activities for which he had not been prosecuted, and that he was at one time affiliated with a South American drug cartel. Reziniano further testified that he was involved in laundering money for drug dealers, possessed identification under three different names, and was known at various times as David Reziniano, David Freeman, David Rabin, Leo Horowitz, and Reggie.

After the district court declared a mistrial, Reziniano's attorney, Randy Sue Pollock, contacted the government in an attempt to resume her client's deportation proceedings. The government explored whether it would be possible to release Reziniano and arrange for his return in the event of a retrial. The government did not, however, notify the district court or Yida's defense counsel about these conversations or about Reziniano's subsequent release and deportation. After receiving assurances from both Reziniano and Pollock that Reziniano would return to testify if asked, and receiving advance approval from DHS to have him paroled back into the United States, the government agreed to Reziniano's deportation. The government also agreed to pay for Reziniano's airfare, hotel, food, and incidental expenses if it called upon him to testify at the retrial. After the government released Reziniano's material witness warrant, he was returned to DHS custody and deported to Israel.[4]

Pollock continued to communicate with Reziniano after his deportation in order to keep him apprised of developments in the Yida case. On June 12, 2006, Reziniano called Pollock and said that he would not return to the United States to testify because "he needed to obtain medical treatment and . . . he had not been well since his return to Israel." Pollock and another former attorney for Reziniano, Michael Stepanian, were unable to convince Reziniano to return to testify. They then notified Assistant United States Attorney Dana Wagner and gave him Reziniano's contact information.

Both Wagner and Special Agent Miller called Reziniano and tried to convince him to fulfill his promise to return and

---

[4]The government advises that it decided not to serve "Reziniano with a trial subpoena prior to releasing him because no trial date had yet been set, because such a subpoena would have been unenforceable once Reziniano left the United States, and because it was concerned that the invocation of compulsory process would alienate Reziniano and make him less likely to honor his commitment to return."

testify. Reziniano told the government that he was having medical problems related to the conditions he had developed in custody, including a bleeding stomach that might require surgery, and that he was unwilling to leave Israel until these problems were resolved. He estimated that it would be months until he would be able to travel internationally. The government reiterated that it would pay all expenses related to Reziniano's trip and suggested that he could obtain medical attention while in San Francisco. Reziniano, however, continued to refuse to come to the United States to testify at Yida's retrial.

On July 5, 2006, the government filed a motion in limine seeking to admit Reziniano's testimony from Yida's first trial pursuant to Federal Rule of Evidence 804(b)(1), arguing that Reziniano was unavailable under 804(a)(5) and 804(a)(4). After supplemental briefing and oral argument, the district court, in a well-reasoned memorandum and order, denied the government's motion in limine. *See United States v. Yida*, No. CR 00-00274, 2006 WL 1980390 (N.D. Cal. July 13, 2006).

The district court explained that the dispositive issue "is not whether the Government's efforts to convince a since-deported witness to return to testify were reasonable" but instead "whether the Government's decision to permit Reziniano to be deported in the *first place*, while in the custody of the Government, was a 'reasonable means' to 'procure the declarant's testimony.'" (citing Fed. R. Evid. 804(a)(5)) (footnote omitted) (emphasis in original). After distinguishing our decisions in *United States v. Winn*, 767 F.2d 527 (9th Cir. 1985) (per curiam), and *United States v. Olafson*, 213 F.3d 435 (9th Cir. 2000), the district court considered extra-circuit authority and adopted the First Circuit's application of a reasonable means inquiry to the government's efforts to preserve the presence of a witness within its jurisdiction before, as well as after, the witness was deported. *See United States v. Mann*, 590 F.2d 361 (1st Cir. 1978). Although the district court found that the government had acted in good faith when it

allowed Reziniano to be deported, it did not conclude that the government had acted reasonably. Accordingly, the district court held that Reziniano's testimony could not be admitted under either Rule 804(a)(4) or 804(a)(5)'s hearsay exceptions because he was not an "unavailable" witness.

On July 14, 2006, the government filed this expedited appeal pursuant to 18 U.S.C. § 3731.

## II

"Although we generally review evidentiary determinations involving an application of the Federal Rules of Evidence for an abuse of discretion, we review de novo the district court's interpretation of those rules." *United States v. Norris*, 428 F.3d 907, 913 (9th Cir. 2005) (quoting *United States v. Sioux*, 362 F.3d 1241, 1244 n.5 (9th Cir. 2004)). Thus, we review whether the district court correctly construed the hearsay rule, which is a question of law, de novo and the district court's decision not to admit evidence under a hearsay exception for abuse of discretion. *Olafson*, 213 F.3d at 441.

## III

Reziniano's former testimony,[5] which qualifies as hearsay, is only admissible if one of Federal Rule of Evidence 804's hearsay exceptions, governing unavailable declarants, applies. The government argues that Reziniano is unavailable as a witness under both 804(a)(4)[6] and 804(a)(5).[7] "[I]f the declarant

---

[5]Neither party disputes that Reziniano's testimony from the initial trial constitutes "former testimony," one of the enumerated hearsay exceptions, under Rule 804(b)(1). This is in accord with our precedent and the plain text of the Rule. *See United States v. Mohawk*, 20 F.3d 1480, 1488 (9th Cir. 1994) ("If important witnesses [from a first trial] have become, for one reason or another, unavailable, their former testimony may be introduced at the second trial."); *accord United States v. Vargas*, 933 F.2d 701, 705 (9th Cir. 1991).

[6]Federal Rule of Evidence 804(a)(4) provides that a witness is unavailable where the declarant "is unable to be present or to testify at the hearing

is unavailable as a witness," a court may admit "[t]estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination." Fed. R. Evid. 804(b)(1). All parties agree that Reziniano's statements qualify as former testimony which was subject to cross-examination in accordance with 804(b)(1). This appeal turns on whether Reziniano is "unavailable as a witness" such that his former testimony is admissible at Yida's retrial.

Rule 804(b)(1) implements the command of the Sixth Amendment's Confrontation Clause: "the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The prosecution may not offer proof of a prior statement that is testimonial in nature unless (1) the accused has had, will have, or has forfeited the opportunity to "be confronted with" the witness who made the statement, and (2) the witness is unavailable to testify at trial. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("[T]he Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross examination."). The constitutional requirement that a witness be "unavailable" before his prior testimony is admissible stands on separate footing that is independent of and in addition to the requirement of a prior opportunity for cross-examination. *See Barber v. Page*, 390 U.S. 719, 724-25 (1968) (holding that the admission of prior testimony that had been subjected to cross-examination violated the Confrontation Clause because the state did not prove that the witness was unavailable), *cited with approval in Crawford*, 541 U.S. at 57.

---

because of death or then existing physical or mental illness or infirmity."

[7]Federal Rule of Evidence 804(a)(5) provides that a witness is unavailable where the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other reasonable means."

Underlying both the constitutional principles and the rules of evidence is a preference for live testimony. Live testimony gives the jury (or other trier of fact) the opportunity to observe the demeanor of the witness while testifying. William Blackstone long ago recognized this virtue of the right to confrontation, stressing that through live testimony, "and this [procedure] only, the persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behavior, and inclinations of the witness." 3 William Blackstone, *Commentaries on the Laws of England* 373-74 (1768). Transcripts of a witness's prior testimony, even when subject to prior cross-examination, do not offer any such advantage, because "all persons must appear alike, when their [testimony] is reduced to writing." *Id.* at 374. As the National Association of Criminal Defense Lawyers ("NACDL") amicus brief highlights, the superiority of live testimony as contrasted with a transcript of prior testimony has been equally praised in our own judicial system since its inception. *See, e.g., Mattox v. United States*, 156 U.S. 237, 242-43 (1895) ("The primary object of the constitutional provision in question was to prevent depositions . . . being used against the prisoner in lieu of a personal examination and cross-examination of the witness, in which the accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief."); *see also NLRB v. Universal Camera Corp.*, 190 F.2d 429, 430 (2d Cir. 1951) ("[T]hat part of the evidence which the printed words do not preserve . . . . is the most telling part, for on the issue of veracity the bearing and delivery of a witness will usually be the dominating factors. . . ."); *Broad. Music, Inc. v. Havana Madrid Rest. Corp.*, 175 F.2d 77, 80 (2d Cir. 1949) ("The liar's story may seem uncontradicted to one who merely reads it, yet it may be contradicted . . . by his manner . . . which cold print does not preserve.") (internal quotations omitted).

More recently, the United States Court of Appeals for the Third Circuit voiced the importance of observing, first hand, a witness's demeanor while testifying:

> Demeanor is of the utmost importance in the determination of the credibility of a witness. The innumerable telltale indications which fall from a witness during the course of his examination are often much more of an indication to judge or jury of his credibility and the reliability of his evidence than is the literal meaning of his words. Even beyond the precise words themselves lies the unexpressed indication of his alignment with one side or the other in the trial. It is indeed rarely that a cross-examiner succeeds in compelling a witness to retract testimony which is harmful to his client, but it is not infrequently that he leads a hostile witness to reveal by his demeanor — his tone of voice, the evidence of fear which grips him at the height of cross-examination, or even his defiance — that his evidence is not to be accepted as true, either because of partiality or overzealousness or inaccuracy, as well as outright untruthfulness. The demeanor of a witness, as Judge Frank said, is 'wordless language.'

*Aquino*, 378 F.2d at 548 (quoting *Broad. Music*, 175 F.2d at 80).

Professor Richard D. Friedman of the University of Michigan Law School, in his amicus brief, offers additional reasons for the courts' preference for live testimony, which we find persuasive. First, since "[w]itnesses who testify live at the current trial speak as of the current time," while witness testimony via "transcript speaks as of the time of the prior proceeding, and cannot be updated" the accused can only use recently acquired information in cross-examining a witness if that testimony is live. The ability to cross-examine a witness at trial using the most current investigative information avail-

able cuts to the heart of the Sixth Amendment's confrontation clause. Second, witnesses who testify at both proceedings may expose inconsistencies between the two versions of their testimony, that can be exploited by the adverse party during cross-examination at the second proceeding, but witnesses whose prior testimony is introduced through a transcript at the current trial do not. Again, the core of the accused's right to confront the witnesses against him is implicated. Finally, allowing the prosecution to present a transcript, rather than live testimony, may lead to the presentation of that transcript when live testimony is vulnerable for the prosecution's case.[8]

With this background on unavailability established by the Constitution, the Federal Rules of Evidence, and precedent, we turn to the specific provisions of Rule 804(a) relied on by the government in this case.

## IV

**[1]** Federal Rule of Evidence 804(a)(5) provides that a declarant is unavailable as a witness if he "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance . . . by process or other *rea-*

---

[8]Professor Friedman explains the possibility of prosecutorial manipulation, which is not at issue in this case, but which points to an advantage of live testimony, as follows:

> If the prosecution believed that its case would be stronger by presenting the live, vivid testimony of the witness at the current trial, than by presenting the transcript of the prior testimony, then the prosecution would presumably secure the witness's presence and testimony at the current trial. Suppose, however, the witness's demeanor tends to be such that it diminishes rather than enhances his credibility; similarly, suppose the prosecution believes that cross-examination of the witness at the current trial would likely impeach her testimony more powerfully than would a reading of the transcript from the prior proceeding. In such circumstances, the prosecution might prefer to "stand pat," using the transcript rather than presenting the witness live at trial.

*sonable means*." Fed. R. Evid. 804(a)(5) (emphasis added). These reasonable means must be "genuine and bona fide." *Gov't of the Virgin Is. v. Aquino*, 378 F.2d 540, 552 (3d Cir. 1967); *see also United States v. Lynch*, 499 F.2d 1011, 1023-24 (D.C. Cir. 1974); *cf. Phillips v. Wyrick*, 558 F.2d 489, 494 (8th Cir. 1977) (requiring that a good faith effort be made as a component of the Sixth Amendment right to confrontation). Prosecutors must not only act in good faith but also operate in a competent manner; a prosecutor cannot claim that a witness is unavailable because the prosecutor has acted in an "empty-head pure-heart" way. *See* Fed. R. Civ. P. 11 advisory committee's note. *See also California v. Green*, 399 U.S. 149, 189 n.22 (1970) (Harlan, J., concurring); *United States v. Wilson*, 36 F. Supp. 2d 1177, 1180 (N.D. Cal. 1999) ("The central constitutional inquiry is whether or not the government's actions were reasonable given all the circumstances of a particular case."). Thus, "[e]ven where the absent witness is beyond the court's jurisdiction, 'the government must show diligent effort on its part to secure the (witness') voluntary return to testify.' " *United States v. Mann*, 590 F.2d 361, 367 (1st Cir. 1978) (quoting *Aquino*, 378 F.2d at 551).

This appeal turns on the meaning of "reasonable means" and the relevant time-frame for assessing the proponent's conduct. The government argues that the district court erred by using a "reasonable means" inquiry to assess the government's efforts to procure Reziniano both before and after he was deported, contending that this legal standard is neither found in Rule 804 nor consistent with controlling authorities. In the alternative, the government argues that even if the district court applied the correct legal standard, its application of the "reasonable means" inquiry to the facts of the case was erroneous. Appellee Yida argues that the district court applied the correct standard, appropriately exercised its discretion within the context of both the controlling authorities and the structure of Rule 804, and did not abuse its discretion when it found that Reziniano was not "unavailable" under 804(a)(5).

We have considered the application of Rule 804(a)(5) to deported witnesses on two previous occasions and the government argues that those cases are dispositive. *See Olafson*, 213 F.3d 435; *Winn*, 767 F.2d 527. However, both of these cases involved illegal immigration prosecutions in which material witnesses were removed from the country before trial and were not present to testify. They are readily distinguishable from the instant case.

In *Winn*, the defendant was a passenger in a car stopped by border patrol agents who was subsequently arrested after the agents found four illegal aliens in the trunk. 767 F.2d at 529. After taking statements from aliens Santos and Murillo the agents "chose not to prosecute [Winn] and they returned the two aliens to Mexico." *Id.* Several days later Winn was arrested for smuggling aliens after other border patrol agents discovered fourteen illegal immigrants in the back of a U-Haul truck which was rented in Winn's name. *Id.* "The government charged [Winn] with conspiracy to transport illegal aliens and with four counts of transporting illegal aliens . . . . [which] included the transportation of Santos and Murillo, the two aliens who the government sent back to Mexico." *Id.* On appeal, we affirmed the district court's decision to admit Santos and Murillo's hearsay statements, holding that the government had established unavailability under Rule 804 because "[t]he government had no addresses or any other information that would help locate [them] . . . [and u]nder the circumstances, it was reasonable for the government to make no effort to find the two aliens."[9] *Id.* at 530.

---

[9]In *Winn* we also held that the admission of the hearsay statements did not violate the defendant's confrontation rights under the Sixth Amendment because the statements had certain "indicia of reliability" given the circumstances under which they were made. 767 F.2d at 531. Under *Crawford*, we no longer analyze alleged violations of defendants' confrontation clause rights based on "indicia of reliability," but instead focus on unavailability and prior opportunity for cross-examination. *See* 541 U.S. at 68.

*United States v. Olafson* also involved two witnesses from Mexico who gave statements to border patrol agents conveying that they were Mexican citizens and had entered the United States illegally. 213 F.3d at 438. "[T]he district court concluded that under *Winn*, [the witnesses] were unavailable because they were inadvertently returned to Mexico, were beyond the subpoena power of the district court, and failed to respond to efforts to persuade them to return to the United States to testify." *Id.* at 441. We affirmed, reasoning that the district court's conclusion "was consistent with *Winn*, was well-reasoned and, thus, was not an abuse of discretion." *Id.* at 442.

Notwithstanding the government's arguments to the contrary, neither *Winn* nor *Olafson* is controlling here, as the district court correctly concluded, because neither case considered or addressed Rule 804's unavailability requirement and the government's obligation to use "reasonable means" to "procure the declarant's testimony" in the context of the government's affirmative role in a witness's deportation. The percipient witnesses in *Winn* were deported without the prosecutor's knowledge or involvement; indeed, they were deported before any criminal charges were filed against Winn whatsoever. *See* 767 F.2d at 530. Under these circumstances, the court was not presented with an occasion to assess the reasonableness of the government's actions before the witnesses were deported.

**[2]** In *Olafson*, where the deportation before trial was "inadvertent," the court relied on *Winn* and affirmed the district court's finding that the witnesses were unavailable because despite being contacted by the government, they refused to return to the United States to testify. *See Olafson*, 213 F.3d at 438, 442. While *Olafson* establishes that the government's efforts made after a witness's deportation are reasonable if an affirmative, good faith attempt is made to convince the witness to return to the United States to testify, we have not yet had occasion to consider whether the government's involve-

ment, through the prosecutor's office, in the deportation of a witness should be assessed for reasonableness and considered in our unavailability analysis.[10] Because both *Winn* and *Olafson* are factually distinguishable and did not raise the issue of "whether the Government's role in a witness's deportation affects the reasonableness inquiry into his unavailability," the district court appropriately concluded that there was no Ninth Circuit precedent directly addressing the key issue raised in this appeal.

## V

Several of our sister circuits, as well as a district court in our own circuit, have however, "addressed the issue of whether the government's conduct in a case involving alien witnesses who subsequently left the United States was reasonable and in good faith." *See, e.g., Wilson*, 36 F. Supp. 2d at 1181-82 (surveying cases from the First, Fourth, Fifth, Eighth, and Tenth Circuits, before concluding that the government has a duty to make reasonable and good faith efforts to procure the witness's attendance at trial *before* the witness leaves the United States); *see also Mann*, 590 F.2d at 368 (holding that though the government acted reasonably and in good faith in trying to convince a witness to return to testify for trial, the witness was not "unavailable" under Rule 804(a)(5) because the government made the witness's departure from the country possible); *United States v. Guadian-Salazar*, 824 F.2d 344, 346-47 (5th Cir. 1987) (per curiam) (both the defense and the government agreed that the government had

---

[10]We did not have this issue squarely presented in *Olafson* because the defendant did not argue the unreasonableness of the government's actions, but instead contended that "there was no showing made by the government . . . regarding the procurement of his testimony." *See* Appellant's Opening Brief at 15, *United States v. Olafson*, 213 F.3d 435 (9th Cir. 2000) (No. 99-50216). Moreover, in *Olafson* the witnesses were "inadvertently" deported by the government, whereas here, the government knowingly and willingly deported Reziniano knowing that he was an important witness for their case.

not shown that the witnesses were "unavailable" where the government took videotaped depositions of the witnesses, transported them to the border, served them with subpoenas, and notified them that they were to appear at the border on a specified date to be taken to court and serve as witnesses at trial); *Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 419 (5th Cir. 1992) (noting that it is not unreasonable for the government to detain alien witnesses).

Other circuits, however, have found depositions of out-of-country aliens to be admissible. *See United States v. Terrazas-Montano*, 747 F.2d 467, 469 (8th Cir. 1984) (allowing videotaped depositions of four aliens to be admitted due to the "exceptional circumstances" where the aliens went on a hunger strike, refusing to eat until they were returned to Mexico and the government moved for and was granted permission to take the depositions and deport the witnesses after it was shown that they were suffering "ill effects from not eating" for more than ten days); *United States v. Rivera*, 859 F.2d 1204, 1205-06 (4th Cir. 1988) (affirming the trial court's decision to allow Fed. R. Crim. P. 15 depositions based on "exceptional circumstances" after a motion was made by the illegal aliens' attorney which the government supported, and where defendant was out on bail but the aliens, who were being held solely as material witnesses, remained incarcerated); *see also United States v. Eufracio-Torres*, 890 F.2d 266, 270 (10th Cir. 1989) (affirming the trial court's decision to grant the government's motion to take Fed. R. Crim. P. 15 depositions of illegal alien material witnesses and subsequently admit the testimony at trial after the witnesses were deported and became unavailable, where witnesses, who were not charged with any crimes, were detained for more than six weeks, and defendant was out on bail). These cases however, are distinguishable, along the lines of *Olafson* and *Winn*, whereas the First Circuit's decision in *Mann* is strikingly similar to this case.

In *Mann*, the key witness against the defendant was a seventeen-year-old Australian citizen, Joanne Shine, who was

arrested at an airport in Puerto Rico along with Mann after she was found carrying eleven packages of cocaine. 590 F.2d at 363. While Mann was indicted for importing and possessing with intent to distribute, the charges against Shine for "aiding and abetting" were dismissed by the court. *Id.* Shortly thereafter, the prosecution filed a motion seeking to take Shine's deposition. *Id.* Over the defense's objection, Shine's deposition was taken, at which time "the prosecution returned to Shine both her airplane tickets and her passport." *Id.* Following Shine's departure from Puerto Rico, the defense continued to object "to any contemplated use of the deposition, stating that the government had 'procured' Shine's unavailability by turning over [her] plane tickets and passport, which were evidence in the case." *Id.* In despite of court issuance of a subpoena and a request from the State Department, Shine refused to return to testify. *Id.* The trial court admitted Shine's deposition after receiving assurances from the government that it had offered to pay for her expenses and subsistence and that she had still refused to return. *Id.* at 364.

**[3]** On appeal, the First Circuit stated that its inquiry into the government's efforts to produce the witness "need not [be] limit[ed] . . . to that narrow time frame," i.e. the time frame immediately before the trial but *after* the witness had left the United States. *Mann*, 590 F.2d at 368. Because "[i]mplicit . . . in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent," the court concluded that where the government had such means at its disposal — i.e. retaining the witness's passport and plane tickets which it had seized — and did not use them, "[t]he defendant should not suffer the injury from the government's choice." *Id.* Therefore, the First Circuit held that the government had "failed to demonstrate that the witness was unavailable," when she refused to return from Australia to testify, and set aside the defendant's conviction because it was error for the trial court to admit the witness's prior deposition testimony under Rule 804(a)(5). *Id.*

**[4]** The Ninth Circuit authority on the application of Rule 804(a)(5) to deported witnesses is silent on the issues raised by this appeal — rather than foreclosing them, as the government suggests. We must look elsewhere to determine the reasonableness of the prosecution's conduct here. To that end, we agree with the First Circuit that "[i]mplicit . . . in the duty to use reasonable means to procure the presence of an absent witness is the duty to use reasonable means to prevent a present witness from becoming absent." *See Mann*, 590 F.2d at 368. To be sure, the appropriate time-frame for assessing the government's actions will vary, according to the specific facts presented. Here, it is clear that the appropriate time-frame should not be limited to the government's efforts to procure Reziniano's testimony *after* it let him be deported, but should instead include an assessment of the government's affirmative conduct which allowed Reziniano to be deported to Israel in the first instance, similar to the First Circuit's assessment in *Mann*.

This understanding of an expanded temporal period finds support in Supreme Court case law. *See Roberts*, 448 U.S. at 74 ("The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken *prior to trial* to locate and present that witness.") (emphasis added). We read "efforts undertaken prior to trial," to include the government's actions during the time between the declaration of a mistrial and the commencement of the retrial, particularly where as here, the proponent of the witness's statement is in control of both the witness (because he is in custody on a detainer) and its own decision to re-try the case.

We also agree with NACDL's argument that the "Supreme Court has never extended the concept of unavailability to the point where the government seeks to extend it here — that is, to find a witness unavailable when the government itself shares some of the responsibility for its inability to produce the witness at trial." Instead, the common law and the courts have always required that any introduction of prior testimony

against a criminal defendant be derived from "the *necessities* of the case." *Mattox*, 156 U.S. at 243 (emphasis added); *see also* Joel P. Bishop, *Criminal Procedure*, § 1097, at 691 (2d ed. 1872) (stating that it is "plain in matter of juridical reason that this right to introduce the deposition grows out of the great doctrine of necessity."). "Necessity" means that "the declarant's inability to give live testimony is *in no way the fault of the State*." *Green*, 399 U.S. at 166 (emphasis added); *see also id.* at 167 n.16 (the "necessity" that supports the unavailability doctrine is "the State's 'need' to introduce relevant evidence that through no fault of its own cannot be introduced in any other way").

The government offers no viable alternative standard. It urges us to assess its actions only during the period "immediately before trial" and "after the deportation had occurred." However, as the district court emphasized, "once a witness has been deported, '[a]ny steps taken thereafter . . . were inevitably too little too late," when the witness was no longer within the court's jurisdiction or the government's reach. (quoting *Wilson*, 36 F. Supp. 2d at 1182.). The government would urge us to determine that its only obligation is to avoid acting in bad faith when a witness is subject to its control pursuant to a detainer, and that its obligation to procure the witness's attendance at the retrial through reasonable means does not arise until that same witness is beyond its reach. To support its argument, the government points to the last sentence of Rule 804(a) which states that "[a] declarant is not unavailable as a witness if exemption, refusal, claim of lack of memory, inability, or absence is due to the procurement or wrongdoing of the proponent of a statement for the purpose of preventing the witness from attending or testifying." This last sentence is a catchall provision designed to prevent the admission of hearsay testimony where the witness technically falls under one of the five enumerated categories in 804(a), but the proponent intentionally or wrongfully caused the witness's unavailability. The question of whether the government procured Reziniano's absence through wrongdoing need not

be reached, unless the government first meets its obligation under Rule 804(a)(5) of proving that it used "reasonable means" to procure Reziniano's attendance.

**[5]** Accordingly, we decline the government's invitation to adopt such a cramped and constricted theory of reasonableness, which is not supported by any body of law. Instead, we adopt the First Circuit's approach, as articulated in *Mann*, assessing the reasonableness of the government's actions *both before and after* Reziniano's material witness warrant was released and he was deported.

## VI

Having determined that our reasonable means assessment should not be temporally limited to the government's efforts to procure Reziniano's presence after his deportation, we next consider whether the government acted in good faith and used reasonable means to procure Reziniano's attendance at Yida's retrial.

At the outset, we agree with the district court's determination that the government was neither "motivated in any way by bad faith" nor "engaged in deliberate misconduct [when it] remove[d] the material witness warrant and allow[ed] Reziniano to return to Israel." However, as the district court explained, good faith, "while necessary to a finding of reasonable [means], does not end the reasonableness inquiry" for "good faith is but one component" of that inquiry. We therefore turn to the central question on appeal: whether the government used reasonable means to procure Reziniano's attendance at Yida's retrial.

In support of its motion to admit Reziniano's former testimony, the government argued that it acted reasonably because: (1) Reziniano and his attorney made oral assurances that he would return; (2) he had cooperated with the government prior to the first trial; (3) the government was concerned

about his Fifth Amendment due process rights (because it was keeping him imprisoned solely on the material witness warrant after he had completed his sentence); and (4) the government agreed to pay his expenses to return to testify. The district court addressed each proffered reason,[11] stated facts that supported its conclusion that the government acted unreasonably, and offered alternative courses of action the government could have taken to better ensure Reziniano's presence at the retrial. We agree with and adopt the district court's reasoning as part of our assessment of the reasonableness of the government's actions.

[6] The district court properly gave little weight to Reziniano's oral assurances that he would return, emphasizing Reziniano's status as a "convicted felon who was being deported as a result of his felony." The strength of Reziniano's word is further called into question by his own prior testimony, which included an admission that he had used numerous aliases to avoid detection and continue his criminal activity. As the district court said: "At the very least, Reziniano is not a trustworthy individual." Moreover, the government's decision to detain Reziniano on a material witness warrant for the five months preceding Yida's trial indicated that the "Government acknowledged as much." The government could have no reasonable expectation that Reziniano would return to testify if asked. The district court appropriately concluded that "[a]n oral promise from such an individual, without more, is . . . not a valid reason to determine that he no longer poses a risk of flight."

---

[11]The district court also considered the government's statements about Reziniano's medical condition as a reason why Reziniano was no longer a risk of flight after the first trial. The government does not directly make this argument on appeal, and, even if it were, such an argument is precluded by the government's representation before the district court that it "didn't let [Reziniano] go because he had medical problems." We address the government's argument that Reziniano is unavailable by reason of medical necessity under 804(a)(4) in section VII.

**[7]** The government's reliance on Reziniano's cooperation before and during Yida's first trial, is similarly misplaced and unavailing. As the district court emphasized: "the Government apparently fails to recognize the likelihood that Reziniano cooperated with the Government because he remained in custody for that sole purpose." Again, Reziniano's testimony at Yida's first trial supports this conclusion because he repeatedly indicated that he did not want to be in the United States and had wished to return to Israel since completing his prison sentence in late November 2005. Reziniano's cooperation was a condition of his plea agreement and his testimony could have been compelled by contempt proceedings if necessary. The district court concluded, and we agree, that any cooperation from Reziniano was "coerced in some fashion by the fact that he remained in federal custody" and that "such involuntary cooperation was insufficient to indicate to the Government that he would return to testify once he was deported to Israel."

The government recites a concern about Reziniano's Fifth Amendment due process rights, as contributing to its releasing Reziniano from federal custody. It is true that material witness warrants that require an innocent person to remain in custody raise due process concerns. The district court correctly noted that this case is unlike the situations in *Terrazas-Montano*, 747 F.2d at 467, and *Eufracio-Torres*, 890 F.2d at 270. In particular, this case does not present a situation where the defendant was out on bail and the witnesses, who had not been charged or convicted of any crimes, were detained solely as material witnesses. *See Eufracio-Torres*, 890 F.2d at 270.[12]

---

[12]In *Aguilar-Ayala*, 973 F.2d at 419-20, the Fifth Circuit stated that "undocumented aliens have an overriding liberty interest in not being detained as material witnesses, when the deposition procedure serves as an adequate alternative to prolonged detention." The Tenth Circuit noted a similar concern in *Eufracio-Torres*, 890 F.2d at 270, stating that "[t]he competing interests to be weighed against those [Sixth Amendment rights] of the accused are the witnesses' procedural due process rights." This con-

The district court was troubled by the government's failure to explain why the "calculus [had] changed" after the government initially weighed the due process concerns against the risk of flight in Reziniano's case and "determined that his importance as a witness overcame any due process rights he may have possessed"; and, accordingly, detained Reziniano on a material witness warrant for five months. The district court also emphasized that this was not a situation in which the date for retrial was speculative or potentially far distant, resulting in any "prolonged" custody of Reziniano.[13]

Given these factors, we agree with the district court's assessment that the government's proffered Fifth Amendment concerns do not warrant a conclusion that it acted reasonably in allowing Reziniano to be deported. Indeed, if Reziniano's Fifth Amendment rights were truly the animating factor driving the government's actions, a "number of alternatives to ensure Reziniano's presence at the re-trial while reducing or eliminating his confinement in federal prison" existed, as the district court made clear in its analysis. The existence of such alternatives played a role in the First Circuit's analysis in *Mann*. *See* 590 F.2d at 366 ("Sufficient relief could have been offered the witness by placing her in lesser custody, or perhaps simply by supplying maintenance, and retaining her passport and ticket."); *see also Wilson*, 36 F. Supp. 2d at 1182

cern in *Eufracio-Torres* was heightened by the fact that while the material witnesses, who were not charged with a crime, remained in custody, the defendant was free on bail. *See id.* Yida, on the other hand, had spent more than a year in custody before his retrial and was charged with a serious crime that would result in a significant sentence if convicted.

[13]As the district court pointed out: "The Government acknowledged at the pretrial conference that it made the decision to retry defendant immediately, and it therefore knew that a re-trial date would be imminent, or at least within its control. Notably, this was not a situation where Reziniano's detention would be of a 'prolonged' nature, particularly when considered in light of the fact that he had already spent a significant amount of time in custody."

(discussing good faith and reasonable efforts as affirmative actions "such as issuing a subpoena, arranging payment of travel expenses, or taking affirmative steps to ensure the alien remains in the United States until trial").

[8] Because the choices open to the government were not limited to either detaining Reziniano or deporting him, it is hard to credit the government's Fifth Amendment argument, particularly its conclusion that such concerns compel a finding that deportation was reasonable under the circumstances. Instead, the government could have released Reziniano from federal custody, but required him to remain in the United States until he had testified at the retrial. Such release might have been accompanied by the confiscation of his passport, service of a subpoena, and the imposition of conditions on his release such as home confinement, limited travel, and/or some form of electronic detention. *See, e.g., Mann*, 590 F.2d at 366; *see also United States v. Linton*, 502 F. Supp. 878, 879-81 (D. Nev. 1980) (requiring witness after deposition to adhere to conditions including twice-weekly probation visits and restricted travel within a particular state).

[9] *Linton* illustrates another option the government did not exercise: the taking of a video-recorded deposition of Reziniano before his release. The government argues that doing so would not have made a difference in this case, because video depositions, like testimony from a prior trial, can only be admitted if the witness is unavailable. While this is true, our assessment of the reasonableness of the government's actions would be altered if its efforts included the taking of a witness's video-recorded deposition before allowing deportation to occur. A video deposition, when considered in light of the advantages of live testimony discussed earlier, would be almost as good as if Reziniano had testified live at the second trial and better than use of his testimony from the first trial. A video deposition would: (1) allow the jury to observe Reziniano's demeanor; (2) allow Yida to use information acquired since his first trial in examining Reziniano;

(3) allow Yida to develop and explore any inconsistencies between Reziniano's testimony at the first trial and testimony during the video deposition; and (4) avoid the possibility of the government using the transcript because it believes that "it may fare worse if the witness has to testify again." As Professor Friedman argues, had a video deposition been taken:

> [T]he situation would be very close in effect to the optimal situation, in which Reziniano testifies live at the [second] trial. The difference would be sufficiently narrow, at least absent a showing that Yida was substantially disadvantaged by the timing of the deposition, that the Government could argue forcefully that it acted reasonably in not further delaying Reziano's deportation, which would be necessary to ensure his presence at the second trial.

The district court reached a similar conclusion, and criticized the government for failure to notify either Yida's defense counsel or the court that it was considering allowing Reziniano to be deported. If the government had sought "guidance as to an appropriate way to handle a delicate situation," the district court stated that it might "have been able to arrange for a video deposition of Reziniano while he was in custody in order to expedite his return to Israel" as the courts had done in *Terrazas-Montano* and *Eufracio-Torres*. The district court further explained that:

> Notably, the Government does not wish to conduct a Rule 15(a) videotaped deposition in Israel of Reziniano because it claims such testimony would be redundant given his former testimony at trial. While indeed the testimony may be redundant, it goes without saying that a jury's ability to measure a witness's credibility, which directly implicates the Confrontation Clause rights of the accused, is significantly enhanced if the jury can actually see the witness tes-

tifying, as opposed to merely listening to testimony read cold by a neutral individual.

The district court concluded that the "obvious implication" of the government's decision to allow Reziniano to be deported without notifying the court or defense counsel, was "that the Government was more willing to allow Reziniano to leave the country once it had his trial testimony." *See Mann*, 590 F.2d at 367 (faulting the government for not making "as vigorous an attempt to secure the presence of the witness as it would have made if it did not have the prior recorded testimony"). Relying further on *Mann*, the district court reasoned "[w]here, as here, the testimony plays a significant role in the Government's case, the standard of reasonableness is further heightened because the accused's Confrontation Clause rights are strengthened." *Cf. id.* at 367 n.6 ("A lesser effort might be reasonable where the testimony goes to minor, collateral, or uncontested matters.").

[10] We agree with the district court and conclude that the government's decision to deport Reziniano without informing either the court or Yida's counsel, without taking a video deposition, and without having any means of compelling his return, was not reasonable, particularly when contrasted with the alternatives available to the government.[14]

[11] Finally, while the government did offer to pay Reziniano's travel expenses, the district court was "not convinced" that this was sufficient under the circumstances, though it "demonstrates the good faith nature with which the Government handled this matter, . . . it does not demonstrate the Gov-

---

[14]We note however, that it may still be possible to take Reziniano's testimony via video recording or transmission in Israel which could then, in turn, be presented in the courtroom. It is also conceivable that a video deposition could be held in Israel, resulting in either the recording being brought back to the trial or allowing for Reziniano to essentially testify live through a direct video feed to the courtroom. We leave this issue to the district court to address as it sees fit.

ernment's reasonableness." Here, the district court found that while travel payment was certainly a necessary condition to ensuring the return of a foreign witness, alone it was "not a sufficient condition." Referring to Reziniano, the district court noted:

> A witness who poses a risk of flight, who has spent nearly five years in prison serving his sentence for a felony conviction, who has stated that he did not wish to testify in the first trial, and who has expressed his desire to return to his native county [sic], is unlikely to be swayed to return to the United States by the Government's offer to pay his expenses.

The district court sensibly concluded that the offer to pay Reziniano's travel expenses was "effectively the Government's only legitimate effort to ensure that Reziniano would be present at defendant's re-trial."

[12] Here, we are convinced that both extra-circuit law and the plain language of Rule 804(a)(5) — which requires the proponent of a statement to attempt to "procure the declarant's attendance . . . by process or other reasonable means" in order to establish "unavailability" — support a conclusion that the district court did not commit error when it assessed the totality of the government's actions, both before and after Reziniano's deportation to determine whether the government had employed "reasonable means" and accordingly established unavailability under the Rule. The district court explained its finding that Reziniano was not "unavailable" under Rule 804(a)(5) with sound reasoning and did not abuse its discretion. We affirm the district court's denial of the government's motion to admit Reziniano's testimony under Federal Rule of Evidence 804(a)(5).

## VII

**[13]** We also reject the government's argument that Reziniano is unavailable by reason of medical necessity pursuant to Federal Rule of Evidence 804(a)(4). Rule 804(a)(4) provides that a declarant is unavailable as a witness if he "is unable to be present or to testify at the hearing because of death or then existing physical or mental illness or infirmity." The district court found that "Reziniano is not unavailable under Rule 804(a)(4)"[15] and stated that 804(a)(5) "is the only subsection applicable here." The government argues that the district court committed further, independent error "when it refused to consider" the submitted declarations as evidence that Reziniano was unavailable for medical reasons, arguing that although the declarations did not necessarily compel a finding of medical unavailability, they were adequate to support such a finding.

**[14]** We conclude that the district court did not err when it found that the government had failed to establish Reziniano's unavailability due to medical necessity. As Yida points out, "[n]othing about the district court's ruling supports the government's contention that the district court failed to consider the medical-necessity argument." In its written decision, the district court explicitly referred to its conclusions with regard to Rule 804(a)(4) from the pre-trial conference and oral argument on the government's motion. During the July 6th argument, the district court explained its view that there was nothing in the record to suggest that Reziniano's health precluded him from "traveling for a short period of time," and

---

[15]The district court explained its finding in its memorandum and order:

> The Government also contends that Reziniano is unavailable under Rule 804(a)(4) . . . . As the Court concluded in open court at the pre-trial conference, the United States provides no admissible evidence to support a finding that Reziniano is unavailable to testify as a result of medical necessity. Accordingly, the Court finds that Reziniano is not unavailable under Rule 804(a)(4).

that it seemed more likely, based on its observations of the witness and the information presented that Reziniano "just didn't want to come back and testify against his friend." While explaining its concerns, the district court asked the government if there was "a doctor's certificate [stating] that he's unavailable to travel." In response, the government could point to no such medical evidence and almost conceded its argument under 804(a)(4), while it instead focused on 804(a)(5) as the appropriate exception upon which the district court could ground a finding of unavailability:

> And that may be [i.e. Reziniano is not precluded from traveling], but I don't think that, whether it's true or not, bears upon either the question of his unavailability or the question of whether this qualifies as former testimony because regardless of his — I mean, it may bear upon which of the unavailability prongs it falls under, but it doesn't render it impossible for us to do anything further to secure his presence here at this point.

Consistent with the district court's observation, and as the government concedes in its briefing before this court, the declarations submitted by the government "did not necessarily compel a finding of medical unavailability." Instead, the declarations indicated only that Reziniano told the government that he was unwilling to travel until his medical issues were resolved, not that he was unable to do so as a result of medical necessity, as required by Rule 804(a)(4). The district court did not abuse its discretion in requiring more than Reziniano's self-serving statements about his health, as relayed through his conversations with government agents, in order to find him unavailable due to physical illness or infirmity.

It is clear from the transcript and record that the district court considered the government's motion, along with the government's declarations regarding Reziniano's medical problems, and found them to be insufficient to establish

unavailability based on medical necessity. Nothing in the government's supplemental briefing or supplemental declaration offered any further information regarding Reziniano's health, despite the district court's indication that a doctor's certificate or something more indicating that Reziniano could not travel, as opposed to, preferred not to travel because of his health, was necessary. The district court did not refuse to consider the government's proffered evidence as the government contends; rather, it found the evidence insufficient to support a finding of unavailability under Rule 804(a)(4).

## VIII

**[15]** Accordingly, we affirm the district court's exclusion of Reziniano's prior testimony in Yida's retrial because the government has not established that the witness is unavailable under Federal Rule of Evidence 804(a).[16]

**AFFIRMED.**

---

GOULD, Circuit Judge, concurring:

I write separately to point out that, although the majority opinion is grounded solely on the panel's interpretation of Federal Rules of Evidence 804 there is also a constitutional dimension to the concept of unavailability. *See Barber v. Page*, 390 U.S. 719, 724-25 (1968) ("[A] witness is not 'unavailable' for purposes of the . . . exception to the confron-

---

[16]Because we ground our opinion on interpretation of Federal Rule of Evidence 804, we have no need to reach and do not decide whether the Sixth Amendment imposes constitutional requirements concerning unavailability that require the same result. *See, e.g.*, *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 778 (2005) (longstanding doctrine of constitutional avoidance cautions courts to avoids making unnecessary constitutional determinations); *Bellotti v. Baird*, 428 U.S. 132, 146-51 (1976).

tation requirement unless the prosecutorial authorities have made a good-faith effort to obtain his presence at trial."); *see also Ohio v. Roberts*, 448 U.S. 56, 74 (1980).

> The basic litmus of Sixth Amendment unavailability is established: "[A] witness is not 'unavailable' for purposes of the exception to the confrontation requirement unless the prosecutorial authorities have made a *good faith effort* to obtain his presence at trial." *Barber v. Page*, 390 US. at 724-25 (emphasis added) [other citations omitted]. * * * [I]f there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation. "The lengths to which the prosecution must go to produce the witness . . . *is a question of reasonableness*." *California v. Green*, 399 U.S. at 189, n.22, 90 S.Ct., at 1951 (concurring opinion, citing *Barber v. Page*, *supra*).

*Roberts*, 448 U.S. at 74 (emphasis added). *Accord, e.g., Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir. 1994); *United States v. Winn*, 767 F.2d 527, 530 (9th Cir. 1985) (per curiam).

However the Rules of Evidence are interpreted, the Sixth Amendment to the United States Constitution requires that testimony of an absent witness be considered only when the witness is unavailable. *See Crawford v. Washington*, 541 U.S. 36, 68 (2004) ("Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."). Accordingly, if we were to interpret Federal Rule of Evidence 804 to give carte blanche to the government to send a witness who has already testified to a location beyond the court's process, we would have to assess whether that witness was "unavailable" within the meaning of the bounds set by the Sixth Amendment. *See Motes v. United States*, 178 U.S. 458, 474 (1900) ("[T]he question [of admis-

sibility of a prior statement of an absent declarant] cannot be made to depend upon the rules of criminal evidence . . . . It must be determined with reference to the rights of the accused as secured by the Constitution of the United States. That instrument must control the action of the courts of the United States in all criminal prosecutions before them."); *cf. Crawford*, 541 U.S. at 61, 68 (stating that the Confrontation Clause's protection does not turn on "the vagaries of the rules of evidence" but on "what the common law required.").

It is often the correct approach for a court to interpret a statute or rule, when permissible in light of its language, in a way that avoids making unnecessary constitutional decisions. *See, e.g.*, *Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 778 (2005); *Bellotti v. Baird*, 428 U.S. 132, 146-51 (1976); *Reetz v. Bozanich*, 397 U.S. 82 (1970); *Harrison v. NAACP*, 360 U.S. 167, 177 (1959); *Railroad Comm'n v. Pullman Co.*, 312 U.S. 496; *cf. Ashwander v. TVA*, 297 U.S. 288, 346-47 (Brandeis, J., concurring). In my view, the doctrine of constitutional avoidance reinforces the interpretation of Federal Rule of Evidence 804 that we make today.