UNITED STATES of America, Plaintiff,

v.

Stephen WILSON, Defendant.

No. CR–93–0381 DLJ.

United States District Court,
N.D. California.

Feb. 10, 1999.

Elliot R. Peters, Keker & Van Nest LLP, San Francisco, CA, for Stephen M. Wilson, defendant.

Steven F. Gruel, U.S. Atty's. Office, San Francisco, CA, for U.S.

## ORDER

JENSEN, District Judge.

On January 13, 1999, the Court heard argument on the government's motion to admit under Federal Rule of Evidence 804(b)(1) the deposition of Guillermo Diaz, taken on May 8, 1992 by the defense in a civil forfeiture action. Steven F. Gruel and Stephen H. Jigger appeared on behalf of the United States; Elliot R. Peters and Daralyn G. Durie appeared for defendant Stephen Wilson. Having considered the arguments of counsel, the papers submitted, the applicable law, and the record in this case, the Court hereby DENIES the motion.

## I. BACKGROUND

### A. *Factual Background and Procedural History*

Stephen Wilson is pending trial in this Court on a conspiracy charge of drug trafficking. The chief witness against him is an alleged accomplice in the conspiracy, Guiller-

mo Diaz. Diaz is now in Mexico and is beyond the subpoena power of the Court. Upon his refusal to voluntarily return to this country to testify at trial, the Court granted the government's request to take his deposition in Mexico pursuant to Federal Rule of Criminal Procedure 15. All the necessary parties, including defendant and his attorney, traveled to Mexico but no deposition was obtained as Diaz was permitted under Mexican law to refuse to testify.

Based on Diaz' promise to attend, subsequent arrangements were made to hold the Rule 15 deposition in San Francisco. The government arranged for all of Diaz' travel expenses and obtained the necessary Immigration and Naturalization Services (INS) clearances. However, Diaz did not appear at the scheduled time and no Rule 15 deposition was taken. It is apparent now that Diaz will not participate in any such proceeding in the future.

The government now proposes to introduce the testimony of Diaz by way of his deposition taken in a civil case pursuant to the "former testimony" exception to the hearsay rule of Federal Rule of Evidence 804(b)(1). The deposition that the government seeks to have admitted against defendant was taken in the course of discovery proceedings in a civil forfeiture action, which had been brought in 1991 against four items of jewelry, a residence at 5645 Bacon Road, and $300,000 in cash. Wilson contested the forfeiture of approximately $50,887 of the cash and the four items of jewelry. The civil forfeiture complaint was based on the allegation that "Stephen Wilson in concert with Janet Lossa, Guillermo Diaz and others known and unknown, conspired to distribute and distributed quantities of cocaine." Gruel Aff., Exh. C. ¶ 6.

On May 8, 1992, G. William Hunter, Wilson's attorney in the forfeiture action, deposed Diaz in Lompoc federal prison, where Diaz was serving a 10–year sentence following a drug trafficking conviction. Wilson was not present at the deposition. Although it is not established directly by the evidence, the defense suggests that he was not permitted to be present because of the location. The purpose of the deposition was to enable

Hunter to advise his client with respect to the merits of a settlement of the civil action and to consider the possibility of a pre-indictment resolution of the pending criminal investigation. *See id.* ¶ 7. The deposition was specifically requested, either by Hunter or both sides, to occur before the date on which the government planned to return an indictment. *See id.* ¶ 7.

At the time of the deposition, Hunter had been provided affidavits, Title III logs, surveillance logs, 66 audiotapes from a wiretap related to Diaz, and FBI 302 reports related to the investigation of Diaz. Ward Aff., Exh. A. Defendant contends that Hunter had only been given only a portion of the wiretap audiotapes, namely those in which Wilson was a participant or was a subject of the conversation. The government acknowledges that only "selected" audiotapes were provided. However, the government points out that it offered to make all the tapes (save those denominated "grand jury, informant privilege, or work product") available upon request and that Hunter did not make such a request.

Hunter also knew that the government had initiated a grand jury investigation of Wilson for alleged cocaine trafficking and income tax invasion in December of 1988. Ward Aff, Exh. K, ¶ 3. He was further informed that the government intended to return an indictment against Wilson by the end of May 1992 unless a disposition of the case was agreed to. *See id.* ¶ 6. (An indictment was not actually returned against Wilson until July 20, 1993, over a year later.) During the deposition, Hunter learned that Diaz had testified before a grand jury over a year before, but was denied access to that testimony after the government's attorney, citing grand jury secrecy grounds, specifically instructed Diaz not to answer any questions about his testimony to the grand jury. Following Hunter's demurrer that the witness is free to repeat his testimony, the government's attorney asked Diaz' attorney, Murray, to instruct him not to answer questions about the grand jury testimony, which Diaz' attorney did. Hunter also learned from Diaz that Diaz understood that in exchange for his cooperation he would receive a four-year reduction in his sentence. Hunter was not provided with the details of the arrangement at the time of the 1992 deposition.

Following his cooperation, the government moved under Federal Rule of Criminal Procedure 35(b) to reduce Diaz' sentence based on substantial assistance. The Court granted the motion and lowered the sentence by granting a downward departure. Diaz was released from prison on May 18, 1993 and was then deported to Mexico on June 4, 1993. At the time of his deportation he had an American common-law wife and child. The prosecutors in this case claim that they were completely surprised when they learned that the INS had deported Diaz, because they had assumed that Diaz would want to remain in the United States and would contest any deportation attempt. The government concedes that it took no action before the deportation, because of their assumption, to ensure that Diaz would be available as a witness in a criminal trial of Wilson, despite their knowledge of his status as an alien with a felony conviction for drug trafficking.

After returning to Mexico, Diaz was located by Wilson's attorney and gave a sworn statement in which he wholly recanted his prior inculpatory deposition testimony, claiming that he testified falsely as the result of government coaching and pressure.

### B. *Legal Standard*

The deposition at issue was taken as part of a civil forfeiture proceeding, prior to filing of the indictment in this case. Therefore, the government relies on the former testimony exception for the admission of hearsay, instead of the procedures for admitting depositions made pursuant to Federal Rule of Criminal Procedure 15.

Under Federal Rule of Evidence 804(b)(1), the Court may admit the former testimony of a witness if the declarant is now unavailable and the testimony was given in "a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross or redirect examination." *See United States v. Ramos–Oseguera,* 120 F.3d 1028, 1034 (9th Cir.1997), *cert. denied,* —— U.S. ——, 118

S.Ct. 1094, 140 L.Ed.2d 149 (1998); *United States v. Gil,* 58 F.3d 1414, 1419 (9th Cir. 1995).

■ When civil deposition testimony is sought to be admitted in a criminal case under the former testimony exception to the hearsay rule, the Confrontation Clause of the Sixth Amendment prohibits admission unless the statements are necessary and bear indicia of reliability. *See Ohio v. Roberts,* 448 U.S. 56, 66–67, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Christian v. Rhode,* 41 F.3d 461, 467 (9th Cir.1994). The necessity requirement arises from the constitutional preference for a "face-to-face accusation." *Roberts,* 448 U.S. at 65, 100 S.Ct. 2531. The reliability requirement goes to the value of "augment[ing] accuracy in the fact finding process by ensuring the defendant an effective means to test adverse evidence." *Id.* This element is concerned with ensuring that the testimony to be admitted under the exception is sufficiently reliable as "to 'afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement.'" *See id.* at 65–66, 100 S.Ct. 2531 (quoting *California v. Green,* 399 U.S. 149, 161, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

"Certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the" Confrontation Clause. *Id.* at 66, 100 S.Ct. 2531. Such hearsay exceptions are considered to be "firmly rooted." *See id.* at 66, 100 S.Ct. 2531. For firmly rooted exceptions, reliability may be inferred if the requirements of the exception are satisfied. *See id.* The former testimony exception is considered to be firmly rooted. *See id.*

■ Thus, in the case of the former testimony exception, "[n]ecessity is proven by a showing that the witness is unavailable to testify at trial." *Rhode,* 41 F.3d at 467. A witness cannot be found unavailable unless the prosecution has made reasonable good faith efforts to obtain the witness' presence. *See Roberts,* 448 U.S. at 74, 100 S.Ct. 2531; *Rhode,* 41 F.3d at 467. "Good faith" and "reasonableness" are factual matters to be determined case-by-case. *See Rhode,* 41 F.3d at 467. The central constitutional inquiry is whether or not the government's actions were reasonable given all the circumstances

of a particular case. *See Roberts,* 448 U.S. at 74, 100 S.Ct. 2531.

■ The testimony must also bear "sufficient indicia of reliability." *Roberts,* 448 U.S. at 68, 100 S.Ct. 2531. The inquiry into whether the defendant had an opportunity and similar motive to develop the testimony on the prior occasion is part of the reliability inquiry. *See id.* Indicia of reliability are those aspects of the circumstances surrounding the proffered testimony that offer assurances that the jury will be able to determine the truthfulness of the witness and the weight to be accorded to his testimony. *See id.* at 70–72, 100 S.Ct. 2531 (finding that the questions asked on cross-examination were directed at challenging the witness' veracity and truthfulness); *Rhode,* 41 F.3d at 468 (finding that presentation of videotaped testimony was sufficiently reliable because the testimony was taken under oath, cross-examination had occurred, and the jury could observe the witness' demeanor). Whether or not any proffered deposition testimony bears sufficient indicia of reliability is a factual matter to be decided case-by-case. *See Roberts,* 448 U.S. at 64–65, 68–74, 100 S.Ct. 2531.

## II. DISCUSSION

Defendant argues that the government has not established necessity or reliability. To establish the necessity of admitting hearsay testimony sought to be admitted under the former testimony exception, the government must show that Diaz is unavailable. *See Rhode,* 41 F.3d at 467. To establish reliability, the government must show the existence of sufficient "indicia of reliability" to satisfy the requirements of the Confrontation Clause. *See id.*

### A. Necessity: The Unavailability of the Witness

■ Defendant contends that the government should not be permitted to claim that Diaz is unavailable, since the government forcibly deported him one month before the indictment in this case was returned. The decision to permit his deportation is alleged to be evidence that the government did not act reasonably and in good faith in its efforts to procure Diaz's testimony for trial. The

defense does not contest that the government's actions taken after deportation were reasonable and taken in good faith.

In its Order of August 8, 1997, granting the government the right to seek to obtain a deposition of Diaz under Federal Rule of Criminal Procedure 15, the Court provisionally resolved the unavailability question in favor of the government. That finding was made solely for the purpose of resolving the motion in order to permit a Rule 15 deposition and looked only at the reasonableness of the government's efforts to secure Diaz' testimony after his deportation. The Court specifically reserved its decision on whether or not any deposition taken pursuant to the August 8, 1997 Order would be admissible for the trial.

A number of cases have addressed the issue of whether the government's conduct in a case involving alien witnesses, who subsequently left the United States, was reasonable and in good faith. In *United States v. Mann*, 590 F.2d 361, 368 (1st Cir.1978), the First Circuit held that even if the government exercised good faith and reasonableness in trying to convince a witness to return to testify for trial, the witness should not be found "unavailable" if the government made the original departure from the country possible.

Both the government and the defense in another case agreed that the government had not shown that the witnesses were "unavailable." *See United States v. Guadian-Salazar*, 824 F.2d 344 (5th Cir.1987). Although the government took the aliens' videotaped depositions, transported them to the border, served them with a subpoena, and notified them that they were to appear at the border on a specified date to be taken to a court to appear as witnesses at a trial, it did not offer to pay their travel costs, contact them during the intervening months, or send an official meet the witnesses at the border on the specified date. *See id.* Along similar lines, the Fifth Circuit ruled that the government did not satisfy its burden where it offered no evidence that it had made efforts to procure the witness' presence, had subpoenaed the witness, or had tendered a witness fee. *See United States v. Martinez-Perez*, 916 F.2d 1020, 1023 (5th Cir.1990).

In *United States v. Eufracio-Torres*, 890 F.2d 266, 270 (10th Cir.1989), the Tenth Circuit ruled that the witnesses were unavailable where the witnesses were served with trial subpoenas before being released to the INS and were instructed on how to return for trial and how to obtain the necessary travel funds. In that case the witnesses reneged on their promises to appear. *See id.* The Tenth Circuit held that the government was not required to forcibly detain a witness, it need only use a reasonable means to ensure their presence at trial. *See id.*

In commenting on this ruling, the Fifth Circuit noted their view that it is not unreasonable for the government to detain an alien witness. *See Aguilar-Ayala v. Ruiz*, 973 F.2d 411, 419 (5th Cir.1992). The Court stressed that the government at least should consider "paroling" an alien witness into the community in lieu of deportation, or funding and arranging the alien's return for trial prior to release. *See id.* These recommendations are in line with those of the First Circuit, which has stated that the government should take actions to ensure that an alien witness would not leave the country before trial. *See Mann*, 590 F.2d at 368 (stating that the government could have placed the witness under subpoena, retained her travel documents, or placed her in "lesser custody").

Although two cases have found depositions of out-of-country aliens to be admissible, in both of those cases the government took affirmative steps to preserve the testimony of the witnesses for use in a criminal proceeding before they left the country. *See United States v. Terrazas-Montano*, 747 F.2d 467 (8th Cir.1984) (alien witnesses were deported after it became clear that they would starve themselves if they were held in custody); *United States v. Rivera*, 859 F.2d 1204 (4th Cir.1988) (alien witness left voluntarily in lieu of deportation). Furthermore, in those cases the depositions were taken under circumstances that closely approximated trial conditions. Both defendants had a full opportunity to confront the witnesses and were able to present the demeanor of the witnesses to the jury at trial. In both cases, the indictment had been issued at the time of

the deposition and the defendant and his attorney were present at the deposition. *See Terrazas–Montano,* 747 F.2d at 468; *Rivera,* 859 F.2d at 1205–06. In *Rivera,* the attorney entered comments into the record with respect to the demeanor of the witnesses. *See* 859 F.2d at 1206. In *Terrazas–Montano,* the demeanor of the witnesses were recorded on videotape. *See* 747 F.2d at 468. Because reliability was firmly established in these two cases, availability was less of a concern. That is not the case here.

■ At a minimum these cases establish that an alien witness who has left the country, either at the government's instigation or through a failure to detain on the government's part, should be found unavailable unless the government took reasonable and good faith efforts before the witness left the United States to ensure that the witness would be available for trial. Good faith and reasonable efforts require at least some affirmative action, such as issuing a subpoena, arranging payment of travel expenses, or taking affirmative steps to ensure the alien remains in the United States until trial is complete. The facts of this case support neither a finding of good faith efforts nor of reasonable conduct on the government's part. Diaz testified before a grand jury at least one year before the civil deposition in issue was taken, and two years before he was released from prison pursuant to his agreement. The indictment was issued a bare 46 days after Diaz was deported. The government's case against Wilson was wholly dependant on Diaz' testimony. Thus the government had ample opportunity to recognize the value of Diaz to both the defense and prosecution of this case.

The government has produced no evidence that it informed Diaz at the time he was released that he would be expected to testify in any trial likely to arise under the forthcoming indictment. Nor did the government attempt to make arrangements to forestall any deportation proceedings pending the expected indictment. Instead, the government took action to release Diaz from prison and then took it on faith that Diaz would not be deported, despite a felony conviction for drug

trafficking that resulted in a substantial sentence. The Court cannot accept the notion that no action whatsoever, albeit inadvertent, is the equivalent of some good faith reasonable and affirmative action taken to ensure the witness' presence.

In these factual circumstances, the Court finds that the government did not act reasonably in attempting to secure Diaz' testimony for trial. Unreasonable assumptions about his deportation status were made. Although any number of steps could have been taken before his deportation to ensure Diaz' presence at the trial, none were taken. Good faith inadvertence does not change this circumstance. Once deported, Diaz was, as a matter of fact, irretrievably unavailable. Any steps taken thereafter, as amply demonstrated by this record, were inevitably too little and too late. Under these circumstances, the government has not satisfied its burden of showing that Diaz is "unavailable."

### B. *Indicia of Reliability: The Opportunity to Develop Testimony and Similarity of Motive*

The defense contends that Diaz' testimony is not reliable. According to defendants, Hunter did not have a meaningful opportunity to develop Diaz' testimony during the deposition. The contentions are that Hunter did not have a copy of the indictment, which did not yet exist; that Hunter did not have a copy of Diaz' grand jury testimony or any other *Jencks* material to which a criminal defendant would be entitled at trial; and that Hunter did not have transcripts of the wiretaps, which are alleged to implicate Wilson in a cocaine conspiracy. The defense also argues that the defense lacked the same motivation to develop Diaz' testimony in the civil case as he would have had in a criminal case because of differences in strategy and the stakes involved. The government counters that Hunter had both the tools[1] and the motive at the time of the deposition to fully examine Diaz.

Only a few courts have directly addressed any of the relevant issues with respect to civil depositions offered under the former

---

1. For example, the government argues that although defendant may not have had transcripts of the wiretap conversations he did have audiotapes of those intercepts.

testimony exception in a criminal case against the defendant. The Seventh Circuit has held that no meaningful opportunity to develop the testimony exists in circumstances where (1) the defendant's attorney had no knowledge of an agreement between the government and the witness at the time of the deposition; (2) no formal notice of criminal proceedings had been given to the defendant such that he would know against which charges he was to defend; (3) the grand jury investigation had not yet commenced at the time of the deposition; and (4) there was no notice to the defendant that the deposition might be used against him in a criminal proceeding. *See United States v. Feldman,* 761 F.2d 380, 383–84 (7th Cir.1985).

On the issue of the similarity of motive, one court has recommended considering the type of proceedings, the trial strategy suitable to each, the stakes involved, and the number of issues and parties. *See Zenith Corp. v. Matsushita Electric Indus. Co.,* 505 F.Supp. 1190, 1251 (E.D.Pa.1980), *aff'd in part, rev'd in part,* 723 F.2d 319 (3d Cir. 1983).

■ On the reliability question generally, the Ninth Circuit has stated that the key inquiry is whether sufficient elements of confrontation were present to ensure that the evidence is reliable and had been rigorously tested in a manner that results in the functional equivalent of live, in-person testimony. *See Rhode,* 41 F.3d at 468 (quoting *Maryland v. Craig,* 497 U.S. 836, 851, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990)). Confrontation elements that constitute indicia of reliability include an oath, cross-examination, and observation of a witness' demeanor. *See id.* Whether or not independent corroboration of the testimony to be admitted exists can be another factor to be considered. *See id.*

The Supreme Court's statements on the policy behind seeking indicia of reliability offer substantial guidance in determining if there was similarity of motive and opportunity to develop the testimony. According to the Court, the value of an in-person confrontation to the accused is two-fold:

> [T]he accused has an opportunity, not only of testing the recollection and sifting the conscience of the witness, but of compelling him to stand face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief.

*Id.* (quoting *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). The Eighth and Fourth Circuits' cases in which they permitted the use of deposition testimony where the defendant and his attorney had been present at the deposition and were able to record the witnesses' demeanor for the jury are consistent with this policy. *See Terrazas–Montano,* 747 F.2d at 468; *Rivera,* 859 F.2d at 1205–06. Likewise, the Ninth Circuit has indicated in dicta that exclusion of the defendant from being personally present to confront the witness at the time the former testimony sought to be admitted was taken might not qualify as a sufficient opportunity to cross-examine. *See Barker v. Morris,* 761 F.2d at 1400 (1985).

■ All these cases highlight the critical importance of ensuring that the factual circumstances of a given case are such that a jury can adequately assess the truthfulness and reliability of the deponent. Although the defense did directly examine the deponent in this case, other factors weigh so heavily against a finding of reliability that examination alone is insufficient to warrant admission.

The examination of Diaz by Wilson's attorney lacked elements that would make it the equivalent of a trial examination or a Rule 15 deposition. Although defendant had been informally notified that he was under investigation for conspiracy to distribute cocaine, the indictment had not been returned at the time of the deposition such that Wilson had formal notice or specific knowledge of the charges he would face.

Federal Rule of Evidence 804(b)(1) requires that the party conducting the examination have a "similar motive to develop the testimony" as he or she would have at the ultimate trial. In a criminal case, defense counsel examining the prosecution's chief witness has a motive to conduct an exhaustive, probing examination for the purpose of convincing the jury that the testimony is not sufficiently credible to support the govern-

ment's case. It is apparent that defendant's counsel had no such motive in this deposition. To the contrary, the goal of Hunter's examination of Diaz was to gain information to resolve a civil forfeiture case and to aid pre-indictment negotiations, not to fully probe the credibility of Diaz' testimony. In point of fact, the evidence supports the conclusion that Hunter believed that such an inquiry was not warranted, because this was not a deposition meant to be admitted at a criminal trial against Wilson. Examination alone is not sufficient to qualify as an indicia of reliability, that examination must explore the truth and veracity of the deponent. *See Roberts*, 448 U.S. at 70–72, 100 S.Ct. 2531.

There is no question but that the government did not expect that this deposition would be used at a criminal trial of Wilson. Several circumstances establish this conclusion. The government could have, but did not, make any arrangements or make any inquiry of Wilson's counsel, as to the presence of Wilson at the deposition. Obviously the problem of a failure of confrontation was not considered. Additionally, counsel for the government at the deposition treated the issue of prior grand jury testimony as a Federal Rule of Criminal Procedure 6(e) secrecy problem and blocked access to those statements—a course of conduct wholly inconsistent with disclosure of such a statement at a criminal trial. In addition, government counsel provided Hunter with only a limited disclosure of materials which would have to be produced at a criminal trial. As an example, Hunter could ask Diaz about his understanding of the government's promises to him for his testimony, but there was no so-called *Giglio* disclosure of documentation as to the specifics of the government benefits extended to Diaz. Finally, the government lawyer at the deposition, an attorney in the civil division of the United States Attorneys office assigned to civil forfeiture cases, and who was not a participant in the ongoing criminal investigation, declined to ask any questions of Diaz at the deposition. It is beyond question that given this examination conduction, the government had no thought that this deposition was being taken for the purpose of preserving Diaz' testimony for trial.

Hunter clearly shared this obvious expectation as to the purpose of the examination.

Faced with a deposition where the arrangements excluded his client and the government had failed to disclose pre-trial grand jury testimony, the facts of government inducements, and "selected" wiretap evidence, Hunter did not demand his client's presence or additional disclosures, as he could have, because he had no expectation that the deposition would be used as substantive evidence against his client.

This factual background establishes that the defense took this deposition in reliance on the government's stated expectations as to when an indictment would issue, to further settlement proceedings, and without any expectation that this deposition would be admissible in a subsequent criminal trial.

In addition, aside from the obvious differences as to the elements of these cases and their respective burdens of proof, there is simply no rational basis to consider them similar when one considers the possible outcomes. In the civil case $50,887 and four items of jewelry were at stake; in this case Wilson faces loss of liberty through imprisonment and the stigma of a felony conviction. The direct purpose of the deposition was to investigate Diaz' testimony with the goal of settling the civil forfeiture case and to aid negotiations as to possible criminal charges, not to test the truth and veracity of the government's chief witness for the purpose of defending against extraordinarily serious criminal charges. The government has not established similarity of motivation given these differences in case context and the fact that the conduct of the parties was wholly inconsistent with the use of the deposition in a criminal proceeding.

These factors also serve to highlight the fundamental differences between the deposition offered by the government in this case and those which other courts have admitted into evidence against a criminal defendant. No record was made for the jury of Diaz' demeanor during the deposition. Defense counsel was prevented from inquiring into matters that would be fair game at trial or in a Rule 15 deposition and that could have been used to test Diaz' truthfulness. Defendant himself was absent from the proceeding and thus could not confront Diaz face-to-face.

The absence of a record establishing Diaz' demeanor on the occasion of the 1992 deposition is critically important. The government case against Wilson is wholly dependent on Diaz' testimony. A jury's ability to assess his demeanor, and from it his credibility, is critical to a fair determination of the matter. This is not a case where significant independent corroboration of Diaz' testimony exists. The wiretap records and other evidence in this case can at best bolster Diaz' testimony, but are insufficient on their own to show that a conspiracy existed. In this case, the government asks the fact finder to decide that the inculpatory content of the civil forfeiture deposition is true and proves their case. To say this is hotly contested is a gross understatement. Diaz himself in a subsequent statement says that the 1992 deposition is a lie. Diaz has also contradicted his deposition statements in prior statements to the FBI. In proffering this deposition testimony, the government asks a jury to find that the statements in the 1992 deposition are true without ever seeing the witness. Accomplice and informant testimony preceded and effected by government inducements is, with good reason, accepted as appropriate evidence to enable prosecution of the members of organized, clandestine criminal groups. It is also troublesome and the subject of necessary scrutiny. We assign the major role in this scrutiny to the jury and tell them to view this testimony with great caution. In this case, however, the jury would be asked to listen while other people read questions and answers to them without ever seeing or hearing the witness. The jury then would have to decide which disembodied version to adopt. This is not the scrutiny the system demands: the Court cannot view this deposition as the functional equivalent of live, in-person testimony.

This deposition was not taken with the values of the Confrontation Clause in mind, rather all the parties approached the 1992 deposition of Diaz with the expectation that it would not be the equivalent of a Rule 15 deposition and therefore would be unsuitable for admission in a later criminal proceeding. Although the Court can accept the position of the government that its actions were in good faith, on this record, the deposition falls far short of satisfying the requirements of Fed-

eral Rule of Evidence 804(b)(1) and the Confrontation Clause for admission into evidence in a criminal trial. The Court is asked to decide whether or not the factual record, which must be considered case-by-case, would permit the Court to deem this deposition to be the equivalent of an actual confrontation. The Court finds that equivalence does not exist in this case; the government has not met its burden of showing necessity or reliability.

### III. CONCLUSION

Accordingly, because the government cannot establish that it exercised good faith and took reasonable efforts to secure the testimony of Diaz, and cannot establish sufficient indicia of reliability, the deposition testimony of Diaz is inadmissible hearsay and the motion to admit the deposition into evidence is hereby DENIED.

IT IS SO ORDERED.