Filed 10/22/13  P. v. Vasquez CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B243853 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA083223) |
| v. | |
| PEDRO CARACUN VASQUEZ, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Teri Schwartz, Judge.  Affirmed in part, reversed in part, and remanded for further proceedings.

Jennifer Hansen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and Herbert S. Tetef, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

Pedro Caracun Vasquez appeals from a judgment following his conviction for attempted murder, assault with a deadly weapon, mayhem, and criminal threats. He contends that the evidence was insufficient to sustain his conviction for attempted murder. He further contends that the trial court erred in admitting a victim's prior testimony, after determining that the victim was unavailable. Both parties also raise sentencing issues. We affirm the convictions, correct a sentencing error, and remand for further sentencing.

## PROCEDURAL BACKGROUND

A jury convicted appellant of the attempted murder of Juan Carlos Arita (Pen. Code, §§ 187, subd. (a)(1), 664; count 1),[1] assault with a deadly weapon of Noel Pineda (§ 245, subd. (a)(1); count 2), mayhem upon Arita (§ 203; count 3), and criminal threats against Pineda (§ 422; count 4). In addition, on all counts, the jury found that appellant personally used a deadly weapon (§ 12022, subd. (b)(1)). As to count 1, the jury also found that appellant personally inflicted great bodily injury on Arita (§ 12022.7, subd. (a)).

On September 6, 2012, the trial court sentenced appellant to prison for nine years and eight months. The sentence consisted of the low term of five years on count 1, plus three years for the great bodily injury enhancement, one year (one-third the middle term of three years) on count 2, and eight months (one-third the middle term of two years) in count 4. The court imposed and stayed a one-year term on count 3, and stayed the weapon use enhancements. The court also imposed various fines and fees, including a $200 restitution fine pursuant to section 1202.4, subdivision (b). Appellant filed a notice of appeal the same day.

---

[1]    All further statutory citations are to the Penal Code, unless otherwise stated.

On October 31, 2012, the trial court issued a nunc pro tunc order, increasing the restitution fine to $240.

## FACTUAL BACKGROUND

Pineda and Arita worked as day laborers. They knew each other from their time together looking for work. Pineda lived in a house with his wife and children. Arita was homeless.

On May 8, 2011, Arita spent the night at Pineda's house. The next morning, he showered and left around 7:00 a.m. Around 10:00 a.m., Arita called Pineda and asked him to come to a homeless encampment near a freeway in Pasadena. Arita said it was his birthday. Pineda went. He climbed through a hole in the fence near the freeway and walked down to the encampment. Arita, appellant, and two other individuals were drinking vodka. Pineda had seen appellant on many occasions before near his house; he also identified appellant at trial. Pineda, who did not drink alcohol, stayed at the encampment for about an hour while the other men drank. Then he left.

Later that evening, Pineda went back to the encampment. When Pineda arrived, he observed Arita on the ground. Arita was moving and yelling, "No. No." As Pineda got closer, he saw appellant standing over Arita with a 12-inch screwdriver in his hand. Appellant was repeatedly striking at Arita's neck and head with the screwdriver. Pineda yelled at appellant to stop. Appellant turned around and looked at Pineda. He then said, "You saw me now. I'm going to kill you." Pineda ran away.

Pineda went through the hole in the fence and down the street. Appellant chased him with the screwdriver in his hand. At a street intersection, Pineda turned right and appellant turned left. When Pineda saw that appellant was no

3

longer chasing him, he turned around and followed appellant. After seeing appellant go down a driveway into a residential property, Pineda called the police.

Officers arrived and set up a containment of the area. A police dog found appellant and pulled him out from some shrubbery. Appellant was arrested and transported to the hospital for treatment.

Meanwhile, Pineda guided an officer to Arita. Arita was moaning and crying in pain. He was holding his ear with one hand and his ribs with the other hand. There was a small amount of blood inside his sleeping bag and on the mattress under the sleeping bag. Paramedics arrived and treated Arita. He was then transported to the hospital. At the hospital, Arita said he was sleeping when someone stabbed him in his head. That person also took his cell phone, phone charger, and $50.

At trial, Arita's preliminary hearing testimony was read to the jury. At the hearing, Arita testified that he started drinking at 7:00 a.m. on the day of the incident and consumed two or three bottles of vodka. He was sleeping when someone attacked him. The person cut his ear and stabbed him in the left side of his rib cage and his head with a screwdriver. Arita did not see who stabbed him.

The parties stipulated that Arita was treated at the hospital for minor abrasions to the left side of his face and puncture wounds to his left chest and upper arm. He also required sutures for a laceration on his left ear. His blood alcohol level was .346 when he was admitted to the hospital. The parties also stipulated that Arita was convicted in September 2011 for misdemeanor assault with a deadly weapon and attempted criminal threats arising from an unrelated July 2011 incident.

Appellant testified in his defense. Prior to his arrest, he lived at the homeless encampment near the freeway. He had lived there for a year. On the day

4

appellant was arrested, he began drinking at 6:00 a.m. with Arita and some other friends. Later that day, appellant left the encampment because the police had given everyone a deadline to move out of the encampment. Appellant then drank alcohol with some friends at two separate locations. Later, he went to a location to sleep, and was arrested there. Appellant stated he never went back to the encampment, and denied assaulting or attacking Arita.

The parties stipulated to the following facts. Appellant's blood alcohol level was .34 when he was arrested. Appellant was in possession of a cell phone and $24.36 at the time of his arrest, but the cell phone did not appear to belong to Arita. The weapon used to attack Arita was never recovered. DNA testing on blood found on appellant's clothing matched appellant's DNA profile; it did not match Arita's DNA profile.

## DISCUSSION

Appellant contends (1) that his conviction for attempted murder should be reversed, as there was insufficient evidence to show he had an intent to kill; and (2) that the trial court erred in determining that a victim was unavailable for trial and admitting the victim's prior testimony. Both parties also raise sentencing issues. We address each issue in turn.

A.    Sufficiency of Evidence

"In determining whether the evidence is sufficient to support a conviction . . . , 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citations.] Under this standard, 'an appellate court in a criminal case . . . does not ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citation.] Rather, the reviewing court 'must review the whole record in

5

the light most favorable to the judgment below to determine whether it discloses substantial evidence -- that is, evidence which is reasonable, credible, and of solid value -- such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.]" (*People v. Vy* (2004) 122 Cal.App.4th 1209, 1224, italics omitted.) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

"'Attempted murder requires the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1217, quoting *People v. Booker* (2011) 51 Cal.4th 141, 177-178.) A defendant's intent to kill may be inferred from the defendant's acts and the circumstances of the crime. (*People v. Avila* (2009) 46 Cal.4th 680, 701 (*Avila*), citing *People v. Smith* (2005) 37 Cal.4th 733, 741.) Here, Pineda, who knew appellant, observed him stabbing Arita in the head and neck areas repeatedly. As our Supreme Court has stated, evidence that a "defendant repeatedly attempted to stab . . . an unarmed and trapped victim, and succeeded in stabbing him in the arm and leg . . . alone is substantial evidence of defendant's intent to kill." (*Avila*, at pp. 701-702.)

Appellant contends the use of a nontraditional weapon, the "superficial nature of Arita's wounds," and appellant's intoxication indicated he had no intent to kill Arita. We disagree. First, the jury found that the 12-inch screwdriver was a deadly weapon, as it was used to attack vulnerable areas, such as the head, neck, and left side of the rib cage. A deep puncture to any of those areas could have

6

caused Arita's death.  (Cf. *People v. Russell* (1943) 59 Cal.App.2d 660, 665 [sustaining conviction for assault with a deadly weapon where defendant used a two-and-a-half-inch fingernail file to attack victim's face].)  Second, "the degree of the resulting injury is not dispositive of defendant's intent.  Indeed, a defendant may properly be convicted of attempted murder when no injury results."  (*Avila, supra*, 46 Cal.4th at p. 702.)  Finally, the jury was instructed that it "should consider the [appellant's] voluntary intoxication" in deciding whether he had the required specific intent or mental state.  The jury impliedly found that appellant could, and did, harbor the specific intent to kill.  Substantial evidence supports the jury's finding.  Appellant was sufficiently sober to recognize that he had been observed attacking Arita, to threaten to kill the witness (Pineda), and to pursue Pineda through a hole in a fence and into the nearby streets.  Accordingly, there was substantial evidence in the record to sustain appellant's conviction for attempted murder of Arita.

B.    Confrontation Clause Claim

Appellant next contends his convictions for attempted murder and mayhem should be reversed, as he was denied his constitutional right to confront his accuser when the trial court admitted Arita's preliminary hearing testimony at trial.

1.    Relevant Background

On August 8, 2012, the day before trial, the prosecutor sought to introduce Arita's preliminary hearing testimony at trial, arguing that Arita was unavailable. At the evidentiary hearing held that day, Brent Smith, a supervising investigator with the Los Angeles County District Attorney's Office, testified about his efforts to locate Arita.  Smith testified that the prosecutor asked him a month before trial to subpoena Arita.  When Smith attempted to do so, he discovered that Arita had been deported to Honduras.  On August 6, 2012, Smith learned from a contact

7

person at the Department of Homeland Security (DHS) that Arita had been deported on December 29, 2011. Smith then tried to locate Arita through the CLETS database, which contains information from the Los Angeles County Sheriff's Department, the California Department of Justice, and the Department of Motor Vehicles, but he was unsuccessful. Smith did not check with other counties or states, but noted that if Arita had been convicted in other counties or states, the information would have shown up in the CLETS database. Smith also did not attempt to contact Arita in Honduras.

On the morning of the hearing, Smith went to a location Arita had been known to frequent when seeking work. Smith showed a photograph of Arita to several day laborers. They said they knew Arita but had not seen him since he had been deported. Smith also went to the homeless encampment but did not find Arita there. Smith was similarly unsuccessful when he tried to contact Pineda to inquire about Arita.

After Smith testified, the prosecutor informed the court that Arita had been prosecuted by the "Pasadena city prosecutor," had been convicted of an assault that occurred in July 2011, and had been deported because of his conviction. Defense counsel argued that the prosecution had not made a sufficient showing of unavailability because it had not attempted to contact Arita in Honduras and had made inadequate attempts to find him locally. Counsel also noted that no evidence had been presented that the United States lacked a treaty with Honduras for "cooperation for the return of witnesses."

The trial court ruled as follows:

"The statute requires a reasonable diligence. I think once the People determined that the witness had been deported by the Department of Homeland Security, I don't know what more they could have reasonably done. I think what the investigator testified to, though, in checking the databases, in checking whether or not he picked up any other cases, went out

8

looking for him at . . . what he thought was going to be a homeless encampment and then went to a work site. I think those efforts constitute reasonable diligence.

"While I agree, perhaps, more could have been done, I don't know that I can say more needed to be done before the People could establish his unavailability. He's nowhere within the jurisdiction of the court and I don't know how the People could compel his attendance when he's not within the jurisdiction of the court and, in fact, [was] deported by the federal government.

"So I'm going to allow the prelim[inary hearing] testimony to come in[,] finding that the witness is unavailable by the People's exercise of reasonable diligence to compel his attendance."

2.      Analysis

Under the confrontation clause of the Sixth Amendment to the United States Constitution, a criminal defendant has the right to confront the prosecution's witnesses. An exception to the confrontation requirement is where a witness is "unavailable" and has given testimony at previous judicial proceedings against the same defendant and was subject to cross-examination. (*People v. Herrera* (2010) 49 Cal.4th 613, 621 (*Herrera*).) A witness is considered unavailable for purposes of the Sixth Amendment when the prosecution has made a good-faith effort to secure his presence at trial. (*Ohio v. Roberts* (1980) 448 U.S. 56, 74, overruled on other grounds by *Crawford v. Washington* (2004) 541 U.S. 36.) Similarly, Evidence Code section 240 provides that a witness is unavailable when he or she is "[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (Evid. Code, § 240, subd. (a)(5).) "The constitutional and statutory requirements are 'in harmony.'" (*People v. Smith* (2003) 30 Cal.4th 581, 609, quoting *People v. Enriquez* (1977) 19 Cal.3d 221, 235.) We review the trial

9

court's resolution of disputed factual issues under the deferential substantial evidence standard, and independently review whether the facts demonstrate prosecutorial good faith and reasonable or due diligence. (*Hererra*, *supra*, 49 Cal.4th at p. 623).

In determining whether Arita was unavailable, we find *Mancusi v. Stubbs* (1972) 408 U.S. 204 (*Mancusi*) and *Herrera* instructive. In *Mancusi*, the United States Supreme Court affirmed a state court's determination that a witness who was permanently residing in a foreign country was unavailable for purposes of the Sixth Amendment's confrontation clause. The court held that the prosecution had established the desired witness's unavailability by showing that the witness resided in a foreign nation and that the state was powerless to compel the witness's attendance, either through its own process or through established procedures dependant on the voluntary assistance of another government. Under these circumstances, "good . . . faith" did not require additional efforts by the prosecution. (*Mancusi*, at pp. 212-213.)

In *Herrera*, the California Supreme Court held that the prosecution had demonstrated good faith and exercised due diligence where: (1) the district attorney investigator testified that he learned from a DHS special agent that the witness had been deported to El Salvador, (2) the investigator unsuccessfully attempted to locate the witness at locations he had formerly frequented and through information in a law enforcement database, (3) a foreign prosecution investigator contacted law enforcement authorities in El Salvador in an unsuccessful attempt to locate the witness there, and (4) the United States and El Salvador did not have an agreement or treaty to compel or facilitate the witness's attendance at trial. (*Herrera*, *supra*, 49 Cal.4th at pp. 629-630.) The court rejected the contention that the prosecution should have known of the witness's pending deportation. It held

10

that the prosecution is not required to keep "'periodic tabs'" on every material witness in a criminal case. The court also rejected the argument that the prosecution should have started its efforts to locate the witness earlier. The court held that further efforts to locate the witness would have been futile, as El Salvador did not have an agreement with the United States for procuring a witness's attendance at trial in California. (*Id*. at pp. 630-631.)

Here, Smith testified he was informed by DHS personnel that Arita had been deported to Honduras on December 29, 2011. He previously attempted to track down Arita through the CLETS database, but was unsuccessful. Moreover, Smith was unsuccessful in his attempts to locate Arita at sites that Arita had frequented. In addition, appellant did not argue below, and does not suggest on appeal, that Honduras has an agreement or treaty with the United States for procuring a victim's attendance at trial in this state. Although Smith did not attempt to contact law enforcement in Honduras, we conclude that such an effort was not required in order to demonstrate prosecutorial good faith and due diligence. Neither at trial, or on appeal, has appellant identified how the prosecutor or the court could have secured the presence of Arita, a deportee not charged with any offenses in the instant matter. (*Herrera*, *supra*, 49 Cal.4th at p. 631 [good faith does not require prosecutor to engage in futile acts].) For the same reason, earlier attempts or further efforts at locating Arita were not required.

*People v. Sandoval* (2001) 87 Cal.App.4th 1425 (*Sandoval*), cited by appellant, is distinguishable. There, the appellate court determined that a witness who resided in Mexico was not unavailable, as the United States and Mexico had a mutual legal assistance treaty that would assist the prosecution in procuring the witness for trial. (*Id*. at pp. 1439, 1443-144.) As noted, appellant does not argue a similar treaty exists between Honduras and the United States.

11

Appellant's reliance on *People v. Roldan* (2012) 205 Cal.App.4th 969 (*Roldan*), *United States v. Tirado-Tirado* (5th Cir. 2009) 563 F.3d 117 (*Tirado*), and *United States v. Wilson* (N.D. Cal. 1999) 36 F.Supp.2d 1177 (*Wilson*) is also misplaced. Those cases involved the failure of the prosecutor, who knew the desired witness would be deported, to secure the witness's testimony through means such as videotaping the witness's testimony or detaining the witness as a material witness. (See *Roldan*, *supra*, at pp. 980-981; *Tirado*, *supra*, at p. 123; *Wilson*, *supra*, at pp. 1179, 1182.) In contrast, here, nothing suggests that the prosecutor knew or should have known that Arita would be deported. Arita was prosecuted for an unrelated crime by a different office -- the Pasadena city attorney. He was convicted in September 2011 and deported four months later, a relatively short time frame. Moreover, as noted in *Herrera*, a prosecutor is not required to keep "'periodic tabs'" on every material witness in a criminal case. (*Herrera*, *supra*, 49 Cal.4th at p. 630.) Under these circumstances, we conclude that the prosecution made a good faith effort and exercised reasonable diligence in attempting to locate and procure Arita for trial.

Moreover, even were we to determine that the prosecution did not show good faith or exercise reasonable diligence, we would find any error in admitting Arita's preliminary hearing testimony harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*); *Lilly v. Virginia* (1999) 527 U.S. 116, 139-140 [applying *Chapman* harmless error standard to confrontation clause claims]; accord *Sandoval*, *supra*, 87 Cal.App.4th at p. 1444.) In his preliminary hearing testimony, Arita testified he was drunk and awoke to someone stabbing him with a screwdriver. Arita also testified that he had his cellular telephone and $50 stolen. Arita never identified appellant as the person who stabbed him. In addition, when arrested, Arita's telephone was not found on

appellant's person, and exactly $24.36 was found on appellant. Thus, Arita's prior testimony was only marginally probative. Indeed, the prosecutor never referred to Arita's testimony during closing argument. Rather, as the prosecutor argued, the "stars of th[e] trial" were Pineda and appellant. Pineda testified he personally saw appellant stabbing Arita multiple times in the head and neck areas. Pineda knew appellant, having seen him before on several occasions, including earlier that same morning. In addition, Pineda's testimony was supported by the injuries sustained by Arita. On this record, the admission of Arita's preliminary hearing testimony was harmless beyond a reasonable doubt.

C.    Sentencing Issues

Both parties raise sentencing issues. Appellant contends that the trial court erred in not staying the sentence on count 4 (criminal threats against Pineda) under section 654. Respondent contends that section 654 did not bar the trial court from imposing both a weapon use enhancement and a great-bodily-injury enhancement on count 1 (attempted murder of Arita). Finally, appellant contends that the trial court violated the ex post facto clauses of the California and federal constitutions by retroactively increasing the amount of a restitution fine and parole revocation fine. We address each issue in turn.

1.    Section 654

The trial court sentenced appellant to one year on count 2 (assault with deadly weapon of Pineda) and a consecutive sentence of eight months on count 4 (criminal threats against Pineda). The court found that the "incident with Mr. Pineda lasted for a little bit of time. . . . I think there were separate acts. The threat was uttered . . . separate and apart from the [assault]." Appellant now contends that his criminal threat against Pineda and his assault with a deadly weapon on

13

Pineda were part of the same course of conduct, and that section 654 barred separate punishment for the two offenses.

Section 654, subdivision (a) provides in pertinent part: "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ." Section 654 bars multiple punishment for separate offenses arising out of a single occurrence where all of the offenses were incident to one objective. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1368.) A trial court's implied finding that a defendant harbored a separate intent and objective for each offense will be upheld on appeal if it is supported by substantial evidence. (*Ibid.*)

Here, the record shows that after Pineda yelled at appellant to stop stabbing Arita, appellant looked at Pineda and threatened to kill him. A trial court could find that appellant had an intent and objective to threaten Pineda when he uttered his threats. The record also shows that Pineda ran away after hearing these words, and that appellant chased after him, with the screwdriver in hand. On this record, a trial court could find that appellant harbored a new and separate intent when he chased Pineda -- to injure Pineda with the screwdriver. Thus, substantial evidence supported the trial court's finding that appellant harbored separate intents and objectives when he first made his criminal threats and then assaulted Pineda by pursuing him while armed with a screwdriver he had just used to attack Arita. (See, e.g., *People v. Solis* (2001) 90 Cal.App.4th 1002, 1009, 1021-1022 [section 654 did not bar consecutive sentences on convictions for terroristic threats and arson where defendant left messages threatening to kill victims and then an hour later, set fire to the victims' house].) Accordingly, section 654 did not bar the imposition of the consecutive eight-month sentence on count 4.

14

2. Section 12022, Subdivision (b)(1) Enhancement

At sentencing, the trial court stated its belief that as to count 1, it lacked authority to impose both a one-year weapon use enhancement under section 12022, subdivision (b)(1) and a three-year great-bodily-injury enhancement under section 12022.7, subdivision (a). The court stated, " [M]y feeling is he should get the one year, but I don't believe I can do it. So I am going to impose it and stay it under 654. If there is an appeal, perhaps it will be discussed on appeal." On appeal, the People contend that section 654 does not bar the imposition of both enhancements. We agree that the trial court could have imposed both a weapon use enhancement and a great-bodily-injury enhancement. (See *People v. Ahmed* (2011) 53 Cal.4th 156, 160, 168 [a trial court may impose both one weapon enhancement and one great-bodily-injury enhancement for all crimes].) The People request that we remand to the trial court to permit it to either impose or strike the weapon use enhancement in count 1. Appellant agrees that the appropriate remedy is remand. Accordingly, we will remand this matter to the trial court for further proceedings on this issue.

3. Restitution and Parole Revocation Fines

At appellant's September 6, 2012 sentencing, the trial court imposed a $200 restitution fine pursuant to section 1202.4, subdivision (b) and a $200 parole revocation fine pursuant to section 1202.45.[2] Appellant filed his appeal the same day. While the appeal was pending, on October 31, 2012, the trial court issued a nunc pro tunc order, increasing the restitution and parole revocation fines to $240.[3]

---

[2] The amount of the parole revocation fine must match the amount of the restitution fine (§ 1202.45, subd. (a)).

[3] In 2011, the amount of a restitution fine under former section 1202.4 -- which "shall be set at the discretion of the court" -- ranged from $200 to $10,000.

15

Appellant contends the increased fines violate the ex post facto clauses of the federal and California constitutions. Although the imposition of the $240 restitution and parole revocation fines do not implicate the ex post facto clauses, we conclude the trial court lacked jurisdiction to increase the fines.

"[T]he imposition of restitution fines constitutes punishment, and therefore is subject to the proscriptions of the ex post facto clause and other constitutional provisions." (See *People v. Souza, supra,* 54 Cal.4th at p. 143.) Thus, a defendant may challenge the imposition of a restitution fine under section 1202.4 as violating the ex post facto clauses of the California and federal constitutions, if the fine is greater than authorized by section 1202.4 at the time he committed his crimes. (*Ibid*.) Here, the imposition of the $240 restitution fine was within the trial court's discretion under the operative statute at the time appellant committed his crimes. Thus, the trial court's nunc pro tunc order increasing the amount of the restitution fine did not implicate the ex post facto clauses of the state and the federal constitutions.

Nevertheless, we conclude the trial court lacked authority to increase the amount of the restitution fine. The trial court issued its nunc pro tunc order on October 31, 2012, after appellant had filed his notice of appeal. "Because an appeal divests the trial court of subject matter jurisdiction, the court lacks jurisdiction to vacate the judgment or make any order affecting it," unless certain exceptions apply. (*People v. Alanis* (2008) 158 Cal.App.4th 1467, 1472-1473; accord *People v. Turrin* (2009) 176 Cal.App.4th 1200, 1208.) The exceptions include: (1) recalling a sentence under section 1170, subdivision (d) to resentence

_____

(*People v. Souza* (2012) 54 Cal.4th 90, 143 [explaining former section 1202.4].) Section 1202.4 was amended (effective January 1, 2012) to increase the minimum amount to $240. (§ 1202.4, subd. (b)(1).)

the defendant, provided the "new sentence, if any, is no greater than the initial sentence"; (2) correcting an unauthorized sentence; and (3) correcting clerical errors. (*People v. Alanis*, at pp. 1473-1476.) None of these exceptions applies here. The trial court did not recall the sentence, and the new sentence is greater than the original one. The court's original imposition of a $200 restitution fine was not unauthorized, as the court had discretion to impose that amount under former section 1202.4. Finally, there was no clerical error. The court orally pronounced a $200 restitution fine, and the original abstract of judgment correctly reflected that amount. Thus, the trial court lacked jurisdiction to issue its nunc pro tunc order. Accordingly, the order is void, and appellant is subject only to a $200 restitution fine. In addition, appellant's parole revocation fine must be reduced to the same amount as his restitution fine ($200). (§ 1202.45, subd. (a).)

## DISPOSITION

The convictions are affirmed. The matter is remanded to the superior court for further proceedings in light of this opinion. The new judgment shall reflect the correct ($200) restitution and parole revocation fines.


**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**



MANELLA, J.


We concur:



EPSTEIN, P. J.                                        WILLHITE, J.

17